**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

Filed/Docketed
Apr 29, 2011

| | |
|---|---|
| IN RE: | |
| DAVID WAYNE MILLER, II and HEATHER LEIGH MILLER, | Case No. 09-10147-M Chapter 7 |
| Debtors. | |

| | |
|---|---|
| RICHARD A. WIELAND, UNITED STATES TRUSTEE, | |
| Plaintiff, | |
| v. | Adv. No. 09-01054-M |
| DAVID WAYNE MILLER, II and HEATHER LEIGH MILLER, | |
| Defendants. | |

**MEMORANDUM OPINION**

In this adversary proceeding, Richard A. Wieland, the United States Trustee for this region ("Plaintiff"), requests that the Court deny a discharge to David Wayne Miller, II and Heather Leigh Miller (the "Millers" or "Defendants") under 11 U.S.C.A. § 727(a)(2), (3), (4), (5), and (7). The Defendants admit that their original bankruptcy schedules and statements are replete with errors and omissions, but they argue that those errors were the result of being overwhelmed by the closing of a failing business venture and by the complexity of the bankruptcy process. They argue that amendments made to their schedules and statements in this and two related bankruptcy cases provide clear and complete financial information to the trustee and creditors. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.A. § 1334(b).[1]  Venue is proper pursuant to 28 U.S.C.A. § 1409.  Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C.A. § 157(a).  The granting or denial of a discharge is a "core" proceeding as defined by 28 U.S.C.A. § 157(b)(2)(J).

## Burden of Proof

The Plaintiff asks the Court to deny the Defendants' discharge pursuant to 11 U.S.C.A. § 727(a)(2), (3), (4), (5), and (7).  In order to prevail, the Plaintiff must prove each statutory element by a preponderance of the evidence.[2]  Once the Plaintiff establishes a *prima facie* case for denying the Defendants' discharge under § 727, the burden of going forward shifts to the Defendants.[3]  The ultimate burden, however, remains with the Plaintiff.[4]  In order to further the policy of providing a debtor with a "fresh start," "the Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor."[5]  Even so, "a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor."[6]

---

[1]  Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq*. (West 2011).

[2]  *See* Fed. R. Bankr. P. 4005.  *See also First Nat'l Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156, 1157 (10th Cir. 1991); *cf. Grogan v. Garner*, 498 U.S. 279 (1991).

[3]  *See Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir. 1984); *Everspring Enters., Inc. v. Wang (In re Wang),* 247 B.R. 211, 214 (Bankr. E.D. Tex. 2000).

[4]  *See First Union Nat'l Bank v. Golob (In re Golob),* 252 B.R. 69, 75 (Bankr. E.D. Va. 2000) (citing *Farouki v. Emirates Bank Int'l, Ltd.,* 14 F.3d 244, 249 (4th Cir. 1994)).

[5]  *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997).

[6]  *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996).

## Findings of Fact

The trial of this adversary proceeding spanned three days.  In addition, the parties submitted a pretrial order containing 113 separate stipulations of fact.  A total of 87 exhibits were admitted into evidence.  The Court took judicial notice of an additional 24 documents. The case involves two individuals, numerous corporate entities, and countless transactions.  In order to understand what has transpired, it is necessary to break the facts down into simple components, and build the story from there.

### *The Debtors*

*David Miller*

David Miller is a graduate of Oklahoma State University, with a Bachelor of Arts degree in Psychology, and he holds a Masters in Business Administration from the Robert Kennedy College in Zurich, Switzerland.  He previously owned and operated a wine and spirits business, Le Chateau de Wine & Spirits, which was sold prior to April 2004.  During his years in business, David Miller has maintained financial books and records for his corporate entities.  He has bought and sold businesses, borrowed money from individuals and financial institutions, leased commercial properties, and developed and implemented marketing strategies for his businesses.  David Miller also suffers from an affliction shared by many:  he loves cars, especially American "muscle cars" of the 1960s.

David Miller was responsible for the financial record keeping of his companies, with assistance from an individual named Ellayna May.  After Ms. May began working for David Miller in 2006, Heather Miller did not maintain, participate in the maintenance of, or have responsibility for the maintenance business books and/or financial records relating to David Miller or his

companies.

*Heather Miller*

Heather Miller is a graduate of Oklahoma State University with a degree in apparel merchandising.  She is a person of considerable business experience.  She was a tennis instructor before the opening of Le Chateau de Wine & Spirits.  In 2001, Heather Miller co-founded a company that offers home furnishings and interior design services that remains in business today.  Her business experience includes maintenance of business books and records, tracking and paying bills as the same fall due, reconciliation of bank statements, completion of loan applications, and general sales and marketing.  Her testimony showed her to be intelligent and capable of both understanding and managing business affairs.

**The Corporate Entities**

*Chateau, MMH, Inc.*

After the sale of Le Chateau de Wine & Spirits, David Miller retained a corporate entity named Chateau, MMH, Inc. ("Chateau").  David Miller used the corporate entity of Chateau to purchase a business from Dennis Cockrell/DIJ, Inc.  At the time of the purchase, the business operated an auto restoration shop from a single location in mid-Tulsa.  The purchase included a parcel of real property that was financed by Bank of Oklahoma and Dennis Cockrell/DIJ, Inc.  David Miller set up the business structure so that Chateau held ownership of the real and personal property.  He then created a second corporate entity, Trinity Restoration, Inc., to be the operating entity for an auto restoration business.

*Trinity Restoration, Inc.*

Trinity Restoration, Inc. ("Trinity Restoration") was incorporated to act as the operating

entity for David Miller's auto restoration business.  Because of David Miller's extensive marketing efforts, the business was successful enough that it began renting additional space to conduct its restoration, mechanical, and collision repair operations.  Trinity Restoration and David Miller's other business interests (described *infra*) eventually operated out of no fewer than five locations in the Tulsa area.  They generated over $5 million in gross revenue in 2008.  The largest business location, referred to throughout the trial as the "South Tulsa Location," was a build-to-suit building leased from an individual named David Yonce ("Yonce").    During the heyday of Trinity Restoration's success, one of its significant assets was a widely recognized phone number (the "Trinity Restoration Phone Number").

*Trinity Motorcycles, LLC*

David Miller's interest in motorized vehicles extended to those of the two-wheel variety.  He became familiar with an entity known as Orange County Choppers ("OCC").  OCC manufactures custom motorcycles, or "choppers," many of which sell for far in excess of $100,000.  David Miller wanted to get into this business.   On April 2, 2008, David Miller formed Trinity Motorcycles, LLC ("Trinity Motorcycles"), for the purpose of obtaining an OCC franchise.  Pursuant to Trinity Motorcycles's Operating Agreement dated April 2, 2008, David Miller is the sole owner of Trinity Motorcycles.  Trinity Motorcycles obtained the OCC franchise using $155,000 that David Miller borrowed from Yonce.  Shortly after the formation of Trinity Motorcycles, Trinity Restoration purchased three choppers from OCC.   In June 2008, Trinity Motorcycles borrowed $150,000 from Tulsa National Bank under into a floor plan financing agreement, and purchased three additional motorcycles.  In September 2008, David Miller on behalf of Trinity Restoration borrowed $150,000 from Bank of Oklahoma and pledged his 1969 Chevrolet Z/28 Camaro Cross Ram Sport Coupe that

was valued at $125,000 on Defendants' Schedule B, as collateral for the loan.  As part of this transaction Trinity Motorcycles granted Bank of Oklahoma a security interest in all six motorcycles.

*9800 Memorial, LLC*

On May 16, 2006, David Miller formed 9800 Memorial, LLC ("9800 Memorial").  David Miller held the controlling interest in 9800 Memorial.  On May 16, 2006, David Miller, as managing member of 9800 Memorial executed a Lease Agreement with My Holdings, LLC, an entity owned by Yonce.  The lease was for Trinity Restoration's new South Tulsa Location that contained an option to purchase with financing by Yonce.  On or about February 28, 2009, David Miller caused the dissolution of 9800 Memorial.

*Brand New Muscle Cars, LLC*

In 2008, David Miller formed Brand New Muscle Cars, LLC ("Muscle Cars").  David Miller was its sole owner.  He planned to operate the business of building replicas of classic muscle cars for consumers through Muscle Cars.  Only one sale was ever made.  Muscle Cars ceased business operations prior to January 23, 2009.

*The Home Collection, Inc.*

In 2001, Heather Miller and Maureen Gribben ("Gribben") co-founded The Home Collection, Inc. ("The Home Collection"), which operates a retail business offering home furnishings, accessories, and interior design services.  Prior to 2008, Gribben owned 25% of the stock in The Home Collection, while Heather Miller held the remaining 75% of the company's stock.  The Home Collection leases retail space for use in its business operations.  Heather Miller personally guaranteed the rental obligations of The Home Collection.  In late 2008, The Home Collection was 2 months in arrears on rent payments.  In December 2008 or early 2009, Gribben put

$10,000 of capital into The Home Collection.  The funds were used to bring The Home Collection current on its rental payments.  According to Gribben, this capital infusion was conditioned on the transfer by Heather Miller of all of her shares in the company to Gribben.[7]

Heather Miller testified that she has no understanding of what it means to own stock in a corporation, and that neither she nor Gribben had any understanding of who owned what percentage of The Home Collection.  Heather Miller testified that in December 2008, based on advice of counsel, she gave her shares to Gribben for no consideration.[8]  She testified that there was no connection between her gift of shares and Gribben's capital contribution of $10,000 to The Home Collection.  After the transfer of her stock interest in The Home Collection, Heather Miller has continued to work for The Home Collection as its manager and is primarily responsible for its operations.  In an amendment to their statement of financial affairs, Defendants have stated that the stock had no value and was "transfered [sic] to avoid exposing chapter 7 trustee to potential sales and/or withholding tax liability, which may have forced the chapter 7 trustee, as majority owner, to close the business."[9]

### *The Decline and Fall of the Trinity Restoration*

Although Trinity Restoration and its related entities appeared to flourish at first, David Miller came to the realization that his auto repair and restoration business was not destined to succeed.

---

[7] *See Transcript of Trial, November 8, 2010, Docket No. 47*, p. 97, *ll*. 15 – 17 ("I said that I would put $10,000.00 into the company as a capital call and that I would require that I have her interest in the company.").

[8] *See Transcript of Trial, November 9, 2010, Docket No. 48*, p. 46, *ll*. 24 – 25; p. 47, *ll*. 4 – 13, *ll*. 24 – 25 to p. 48 *ll*. 1 – 2, *ll*. 10 – 12.

[9] *See* Corrected Debtors' Amended Statement of Financial Affairs, *Case No. 09-10147-M, Docket No. 87* at 5 (response to Question 10).

7

Initially, David Miller hoped to resolve matters through a sale of Trinity Restoration and the related entities as a going concern. Such a sale never materialized. David Miller began to consider other options.

David Miller first spoke with Todd Maxwell Henshaw, bankruptcy counsel, regarding bankruptcy options for himself, his wife, and his companies on December 8, 2008. He met with Mr. Henshaw again on December 9, 2008, to discuss bankruptcy options in case a pending sale of his businesses failed to close.

*The Closing of Trinity Restoration*

On December 16, 2008, David Miller publicly announced that Trinity Restoration was "closing." After the announcement, there was a "mad scramble"[10] as employees and customers began arriving to collect their personal tools and vehicles from Trinity Restoration's various retail and storage locations. In an apparent concession to Yonce, the landlord for Trinity Restoration's South Tulsa Location, Defendants moved personal and corporate property of Trinity Restoration and Chateau from the premises before returning possession of the building to Yonce.[11] The move was described as "unplanned and chaotic."[12] David Miller, with the assistance of Heather Miller, transferred furnishings from the South Tulsa Location to the retail location of The Home Collection, where it remained until Bank of Oklahoma, a secured creditor, took possession post-petition. Heather Miller testified that she actively participated in the move and was instrumental in directing

---

[10] Defendant David Miller's Closing Argument, *Docket 45-1*, at 19.

[11] David Miller testified that all of the personal property, including the furniture removed from the South Tulsa Location, were assets of Chateau. *See Transcript of Trial, November 9, 2010, Docket No. 48*, p. 159, *ll*. 2 – 8.

[12] Defendant David Miller's Closing Argument, *Docket 45-1*, at 18.

8

that certain pieces of furniture belonging to Chateau (the "Hawley Furniture") were taken to The Home Collection.[13]  The Hawley Furniture was originally acquired for approximately $30,000 – $35,000 and included pieces from a well-known local furniture designer, including a large office desk.  Heather Miller also testified that she marked "Sold" on all the Hawley Furniture stored at The Home Collection, "kept it all upstairs," and did not intend to sell it.[14]  She stated that she "knew that someone would be coming to take it, so [she] made sure [they] didn't sell it."[15]  In contrast, Yonce testified that Heather Miller told him that her intent was to sell the Hawley Furniture and repay a debt owed to him from the proceeds.  Although Heather Miller testified that she could not recall making such statements to Yonce, she also admitted to being upset at the time, and she could not deny that she had made such statements.

At all times, Heather Miller retained exclusive control over the disposition of the Hawley Furniture while it was stored at The Home Collection.  In addition, two 50" plasma TVs owned by Chateau and several boxes of promotional materials with a book value of $7,500 owned by Trinity Restoration or Trinity Motorcycles were moved from the South Tulsa Location to the Millers' residence.

*Transfers to William Smith*

William "Bill" Smith ("Smith") was employed as a manager and estimator by Trinity Restoration until it closed in December 2008.  Smith currently owns Unique Collision Center, Inc. ("Unique"), an auto body shop in Tulsa.  Smith operates Unique using property that was formerly

---

[13]  *See Transcript of Trial, November 9, 2010, Docket No. 48*, p. 55, *ll.* 12 – 24.

[14]  *See id.*, p. 58, *ll.* 3 – 9.

[15]  *Id.*, *ll.* 5 – 7.

leased to Trinity Restoration.  Prior to the filing date of its bankruptcy petition, Trinity Restoration

transferred office furniture and equipment, two pickup trucks, and one motorcycle to Smith.[16]  Smith

states that these items were purchased from Trinity Restoration for a price equal to or greater than

fair market value.[17]  In December 2008, David Miller arranged for calls to the Trinity Restoration

Phone Number to be forwarded to Smith.  The Plaintiff introduced a business plan for Unique

drafted by Smith, with a printing date of February 28, 2009.[18]  Although the Unique corporate entity

was only formed in December 2008, the business plan gives data for a going concern, reports annual

revenue for the years 2004–2008, and describes Smith as the "new owner."  While the name of

Trinity Restoration is largely absent from the business plan, the history it describes appears to be

that of Trinity Restoration.[19]

*The Failed Deal with Michael Bennett*

Michael Noah Bennett ("Bennett") began working for Trinity Restoration in 2006.  He was

later promoted to be the manager of the restoration division.  He described Trinity Restoration as

running the largest auto restoration business in the city of Tulsa.  In November 2008, David Miller

offered Bennett "a deal to take over a percentage of the business and . . . maybe eventually own it

down the road."[20]  On the day before the public announcement regarding the closing of Trinity

---

[16]  *See* Answer, *Adv. Proc. No. 10-01035-M*, *Docket No. 5* at 2.

[17]  *Id.* at 3.

[18]  Plaintiff's Ex. 41.

[19]  *Id.*  (describing "outstanding number recognition" in the Trinity Restoration Phone Number, a "reputation built over 3 decades of operation," and "a return to the $3,000,000 annual revenue level").

[20]  *Transcript of Trial, November 8, 2010, Docket No. 47*, p. 111, *ll.* 2 – 4.

Restoration, David Miller met with Bennett and proposed a deal for Bennett to take over the restoration business.  He offered Bennett a choice of two locations used by Trinity Restoration.  The proposed transaction would involve getting a new business name, putting Bennett's name on the existing lease, allowing Bennett to keep the Trinity Restoration Phone Number, Trinity Restoration's equipment, and customers, and allowing Bennett to "continue business as normal."[21]  In exchange, David Miller would continue providing marketing services to the business and would draw a salary of $500 per week.  This deal was never consummated.

### *The Bankruptcy Filings*

*The Millers*

On January 23, 2009 (the "Petition Date"), Defendants filed a joint voluntary petition for relief under Chapter 7 of the Bankruptcy Code.  They filed declarations under penalty of perjury that the schedules and statement of financial affairs filed in the case were true and correct.  On Schedule F, Defendants disclosed unsecured debt of $2,214,242.81.  On November 5, 2010, Defendants filed amended schedules as well as an amended statement of financial affairs.  On May 11, 2009, David Miller appeared for a 2004 examination, where he testified under oath.  On April 7, 2010, Heather Miller appeared for a deposition, where she testified under oath.

Scott P. Kirtley ("Kirtley") has been appointed by the U.S. Trustee to serve as the Chapter 7 trustee in the Millers' personal case as well as the Trinity Restoration and Chateau cases.  The first meeting of creditors for the Millers was held on February 19, 2009.  Both Defendants testified under oath that they had read the petition, schedules, statements, and related documents filed in their personal case before they signed them, that to the best of their knowledge the information contained

---

[21] *Id.*, p. 115, *ll.* 10 – 24.

in the petition, schedules, statements, and related documents was true and correct, and that all their assets and creditors had been disclosed.

*Chateau*

On the Petition Date, Chateau filed a voluntary Chapter 7 petition in Case No. 09-10146-M. David Miller, as President, signed declarations under penalty of perjury concerning Chateau's schedules and statement of financial affairs.  As of the Petition Date, Heather Miller was a 50% owner of Chateau.  Heather Miller did not sign Chateau's bankruptcy petition, schedules, or statement of financial affairs.  On Schedule F, Chateau disclosed unsecured debt of $163,701.  On November 5, 2010, Chateau filed amended schedules. These amendments were signed by David Miller, as President of Chateau.

The first meeting of creditors for Chateau was held on February 19, 2009.  David Miller testified under oath as President that he read the petition, schedules, statements, and related documents before he signed them, that to the best of his information, knowledge, and belief the information contained in the petition, schedules, statements, and related documents was true and correct, and that all of Chateau's assets and creditors were disclosed.  Heather Miller attended but did not testify at Chateau's first meeting of creditors.

*Trinity Restoration*

On the Petition Date, Trinity Restoration filed a voluntary Chapter 7 petition in Case No. 09-10145-M.  David Miller, as President, signed declarations under penalty of perjury concerning Trinity Restoration's schedules and statement of financial affairs.  On the Petition Date, Heather Miller was not an officer or director of Trinity Restoration.  Heather Miller did not sign Trinity Restoration's bankruptcy petition, schedules, or statement of financial affairs.  The original

schedules filed on behalf of Trinity Restoration showed that it held 100% of two subsidiaries: Trinity Mechanical, Inc. and AAA Rental Car Company, in addition to holding an interest in Trinity Motorcycles.  On Schedule F, Trinity Restoration disclosed unsecured debt of $1,001,630.  On April 16, 2009, Trinity Restoration filed amended Schedules B and D with a declaration under penalty of perjury on behalf of a corporation or partnership signed by David Miller.  On November 5, 2010, Trinity Restoration filed additional amendments to its schedules as well as an amended statement of financial affairs. These amendments were signed by David Miller, as President of Trinity Restoration.

The first meeting of creditors for Trinity Restoration was held on February 17, 2009.  David Miller testified under oath as President that he read the petition, schedules, statements, and related documents before he signed them, that to the best of his information, knowledge, and belief the information contained in them was true and correct, and that all of Trinity Restoration's assets and creditors were disclosed.  Heather Miller did not testify at Trinity Restoration's first meeting of creditors.

***Admitted Failures to Disclose***

The Millers have stipulated that they failed to disclose the following information in their original schedules and statements of financial affairs in the three cases:[22]

1.      In December 2008 and January 2009, Defendants transferred some of their individual and corporate bank accounts from Bank of Oklahoma to F&M Bank to prevent Bank of

---

[22]  These stipulations are taken from the Pretrial Order, *Docket No. 27*.  They have been edited here as necessary to provide context and clarity and to add additional findings of fact made by the Court.  All references to petitions, schedules, or statements refer to the originals filed in the three related cases.  Where reference to an amended document is made, it is specifically noted.

Oklahoma from taking all funds on deposit by offset.

2.    As of the Petition Date, David Miller owned a Rolex Sub-Mariner watch that was an anniversary gift from Heather Miller.  A sales receipt indicates that Heather Miller paid $3,475 for the watch in May 2000.[23]  Defendants failed to disclose, with specificity, David Miller's Rolex Sub-Mariner watch and its actual value in Schedule B.  David Miller has explained that he considered the watch to be wearing apparel and he included the value of the watch in his wearing apparel, which he valued at $250.

3.    As of the Petition Date, Heather Miller owned a Platinum Diamond Ring that was an anniversary gift from David Miller, with an appraisal furnished to State Farm Insurance, dated June 3, 2000, with a value of $3,550.  As of the Petition Date, Heather Miller owned a three-ring wedding set with diamonds and sapphires, with an appraisal furnished to State Farm Insurance, dated October 11, 1996, with a value of $5,375.  In their original Schedule B filed in their personal case, under the category "Furs and jewelry," the Millers disclosed "Wedding rings, H-$250, W-$1,000.00."[24]

4.    In Question 12 of their statement of financial affairs, Defendants failed to disclose their access to and control of two safe deposit boxes.

5.    On December 20, 2008, prior to the Petition Date, Defendants transferred their ownership of a 1972 Ford Bronco, appraised by David Miller for $8,000, to an insider, Paul Williams, Heather Miller's father, for $1,000.  Defendants failed to disclose in Question 10 of their

---

[23]  Plaintiff's Ex. 12-1.

[24]  *Case No. 09-10147-M, Docket No. 1* at 12.

statement of financial affairs the transfer of the 1972 Bronco.[25]

6. Defendants provided to the Bank of Oklahoma a financial statement of their financial position as of December 31, 2007, reflecting personal property (jewelry, furs, and furniture) valued at $280,000. Defendants failed to disclose in Question 19(d) of their statement of financial affairs that they have provided financial statements annually to the Bank of Oklahoma.[26]

7. David Miller failed to disclose the location of property of Trinity Restoration or Chateau that he left at the rented premises of 7656 E. 46th Street, Tulsa, OK (referred to as the "Vans Glen Property"). Both Defendants participated in and, in part, directed the transfer of assets, including furniture and equipment belonging to Chateau and/or Trinity Restoration that were pledged as collateral to Chateau's/Trinity Restoration's creditors to the Vans Glen Property. David Miller through Chateau/Trinity Restoration transferred a custom-made desk, Trinity Motorcycles's furniture, and miscellaneous equipment to the Vans Glen Property before agreeing to termination of the lease at the request of the landlord, Vans Glen, LLC. The

---

[25] *See* Pre-Trial Order, *Docket No. 27* at 10 ¶ 67. Although not raised by either party at trial or in the pleadings filed in this case, the Court notes that information regarding the transfer of the Bronco to Mr. Williams was provided to Mr. Henshaw in the pre-filing questionnaire filled out by the Millers, but, as stipulated, it was not disclosed in the original statement of financial affairs filed in this case. *See* Plaintiff's Ex. 11 at 20. The Court will not speculate as to why the information did not ultimately find its way onto the original statement of financial affairs.

[26] *See* Pre-Trial Order, *Docket No. 27* at 11 ¶ 81–82. Although not raised by either party at trial or in the pleadings filed in this case, the Court notes that information regarding provision of annual financial statements to Bank of Oklahoma was provided to Mr. Henshaw in the pre-filing questionnaire filled out by the Millers, but, as stipulated, it was not disclosed in Question 19(d) of the original statement of financial affairs filed in this case. *See* Plaintiff's Ex. 11 at 24. The Court will not speculate as to why the information did not ultimately find its way onto the original statement of financial affairs.

relocation and the Petition Date locations of Chateau's and Trinity Restoration's assets are not specified in the original bankruptcy pleadings.

8.      Defendants moved personal and corporate property of Trinity Restoration and Chateau from the South Tulsa Location before returning possession of the rented property to Yonce. Defendants failed to disclose they held property of another, namely Chateau's two 50" plasma TVs at their home.  Defendants failed to disclose they held property of Trinity Restoration or Trinity Motorcycles, namely promotional materials with a book value of $7,500.00 at their home.

9.      In December 2008, David Miller, with the assistance of Heather Miller, transferred furnishings from the South Tulsa Location to The Home Collection where it remained until Bank of Oklahoma took possession post-petition.  David Miller failed to disclose that he had Chateau's property stored at The Home Collection, with Heather Miller's permission and consent.

10.     Defendants' income tax returns disclosed a receivable from Trinity Restoration/Chateau that was improperly recorded as a loan from the Millers to the company, presumably based upon personally guaranteed company debt.

11.     On or about December 20, 2008, David Miller closed the AAA Car Rental Company's Bank of Oklahoma business checking account 7801 with a balance of $690.87.

12.     David Miller failed to disclose in the Defendants' statement of financial affairs any information regarding Muscle Cars.

13.     On December 19, 2008, David Miller was served with a summons in a lawsuit initiated December 18, 2008, in a case styled *Tulsa National Bank vs. Trinity Motorcycles, L.L.C;*

*Trinity Restoration, Inc.; and David W. Miller, II*, in Tulsa County, Case No. CJ-2008-8866. David Miller failed to disclose that he is a named party in the Tulsa National Bank lawsuit in Defendants' statement of financial affairs. David Miller failed to disclose the Tulsa National Bank lawsuit in Trinity Restoration's statement of financial affairs.

14.   David Miller established the David W. Miller II Revocable Trust on September 12, 2007, naming himself as trustee. On December 23, 2008, David Miller on behalf of the David W. Miller II Revocable Trust withdrew from SWS Financial Services, account 1900, funds of $13,275.65, which he listed as the closing of a financial account in his answer to Question 11 in Defendants' statement of financial affairs. David Miller failed to disclose in Question 10 of Defendants' statement of financial affairs the existence of the David W. Miller II Revocable Trust or the transfer of its funds.

15.   On approximately December 19, 2008, David Miller sold his ownership interest in a 2002 Honda Shadow Motorcycle to Smith. David Miller failed to disclose the sale in Question 10 of Defendants' statement of financial affairs.

16.   In January 2009, David Miller sold Trinity Restoration's ownership interest in a 1989 Chevrolet Silverado to Smith for $200. David Miller failed to disclose the sale in Trinity Restoration's statement of financial affairs.

17.   In January 2009, David Miller sold Trinity Restoration's ownership interest in a 2001 Chevy S-10 to Smith for $200. David Miller failed to disclose the sale in Trinity Restoration's statement of financial affairs. Smith subsequently sold the 2001 Chevy S-10 for $400.

18.   In December 2008, David Miller caused Trinity Restoration to sell a Chevy S-10 truck to Greg Lusby for $200. David Miller failed to disclose the sale in Trinity Restoration's

17

statement of financial affairs.

19. On December 1, 2008, and December 9, 2008, David Miller registered trade names of (1) Tulsa Paint Body Mechanical Restoration Inc.; and (2) Trinity Collision, Inc.  These names were not disclosed in Defendants' Schedule B or Question 18 of Defendants' statement of financial affairs.

20. David Miller failed to disclose in his schedules his ownership interest in 9800 Memorial. David Miller failed to disclose on Schedule H that 9800 Memorial was a codebtor.

21. David Miller did not disclose the transfer of Trinity Restoration's motorcycles to Trinity Motorcycles in Question 10 of Trinity Restoration's statement of financial affairs.[27]

22. In October 2008, David Miller, on behalf of Trinity Restoration, borrowed $100,000 and $54,000 from an insider, Ronald Hoffman, his step-father.  David Miller failed to disclose Ronald Hoffman as a creditor in Trinity Restoration's Schedule F or Defendants' Schedule F.

23. As of the Petition Date, Defendants held signatory authority over Chateau's business account at Bank of Oklahoma.  David Miller also held signatory authority over business bank accounts of Trinity Restoration and Trinity Mechanical, Inc.

24. As of the Petition Date, Chateau was owed $15,000 from The Home Collection, which was not disclosed in Chateau's schedules.

25. David Miller failed to disclose in the statement of financial affairs of Defendants' case or the Trinity Restoration case that he had calls to the Trinity Restoration Phone Number

---

[27] This stipulation appears to relate to the fact that Trinity Motorcycles pledged three of Trinity Restoration's motorcycles as collateral to both Tulsa National Bank and Bank of Oklahoma.

forwarded to Smith.  David Miller continued to pay Trinity Restoration's telephone bill post-petition after calls to it were forwarded to Smith until controlling interest in the Trinity Restoration Phone Number was transferred to Smith on May 18, 2010, following Smith's deposition on May 5, 2010.

26.     In December 2008, Heather Miller transferred her 75% interest in The Home Collection to Maureen Gribben, who had been a minority shareholder.  Defendants disclosed in their statement of financial affairs the transfer of Heather Miller's 75% interest in The Home Collection to Maureen Gribben for $10.  After selling her majority interest in The Home Collection, Heather Miller continues to be employed by The Home Collection as its manager.  She also operates the business and makes primary financial decisions for it. Defendants failed to disclose in Question 18 of their statement of financial affairs the nature, location, and name of The Home Collection, including the taxpayer identification number, and the beginning and ending dates in which Heather Miller was the managing executive.[28] As of the Petition Date, Defendants held signatory authority over The Home Collection's business checking account with Bank of Oklahoma.  Heather Miller had primary responsibility for the banking transactions of The Home Collection.

27.     The Home Collection reported $35,718 income for 2007 to Heather Miller on a Schedule K-1, which she included in her 2007 Federal Tax Return 1040.  Heather Miller failed to

---

[28] *See* Pre-Trial Order, *Docket No. 27* at 11 ¶ 73.  The Court notes that this information was provided to Mr. Henshaw in the pre-filing questionnaire filled out by the Millers, but, as stipulated, it was not disclosed in Question 18 of the original statement of financial affairs filed in this case.  *See* Plaintiff's Ex. 11 at 23.  The Court will not speculate as to why the information did not ultimately find its way onto the original statement of financial affairs.  *See also supra* notes 25–26.

disclose income received from The Home Collection, for 2007 and 2008, in Question 1 of Defendants' statement of financial affairs.

28.     Heather Miller was entitled to income from The Home Collection for the month of January 2009 of $1,500 every two weeks.  Heather Miller did not disclose in Defendants' original Schedule I regular salary income from The Home Collection.  On June 4, 2008, Heather Miller transferred personal funds to The Home Collection, in the sum of $13,724.79.  This transaction was not disclosed in the Defendants' original schedules or statement of financial affairs.

29.     As of the Petition Date, Heather Miller held signatory authority as agent, on a financial account in the name of Paul D. Williams and Donna L. Williams Revocable Trust ("Williams Trust") dated February 25, 2000, with Bank of Oklahoma.  Heather Miller failed to disclose the Williams Trust's financial account in Defendants' schedules.  As of the Petition Date, Heather Miller was the designated beneficiary of the Williams Trust, on the death of her parents.  Heather Miller failed to disclose her interests in the Williams Trust.

To the extent the Conclusions of Law contain any items that should more appropriately be considered Findings of Fact, they are incorporated herein by this reference.

## Conclusions of Law

*David Miller*

Section 727(a)(4)(A) of the Code provides that a discharge may be denied where the debtor "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account[.]"[29] The prohibition against discharge extends to situations where a debtor has made a false oath or

---

[29]   § 727(a)(4)(A).

account with respect to an insider of the debtor.[30]  Trinity Restoration and Chateau are insiders of David Miller, and vice versa; accordingly, under § 727(a)(7), any statements made by David Miller in connection with the Trinity Restoration or Chateau cases are subject to evaluation under § 727(a)(4)(A),[31] and may provide a basis for denial of David Miller's discharge.  The United States Court of Appeals for the First Circuit has held that

> the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.[32]

The Fourth Circuit has held that

> [i]n order to be denied a discharge under this section [§727(a)(4)(A)], the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud. The false oath made by the debtor must have related to a material matter. Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is a question of fact.[33]

A statement contained in a debtor's schedules or statement of affairs, or the omission of assets from

---

[30]  *See* § 727(a)(7).

[31]  *See* § 727(a)(7); § 101(31) ("The term 'insider' includes—(A) if the debtor is an individual—(iv) [a] corporation of which the debtor is a director, officer, or person in control; (B) if the debtor is a corporation—(i) director of the debtor; (ii) officer of the debtor; [or] (iii) person in control of the debtor[.]").

[32]  *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987) (citations omitted).

[33]  *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987) (citations omitted). *See also Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1997) ("In order to deny a debtor's discharge pursuant to this provision [§ 727(a)(4)(A)], a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact.").

21

the same may constitute a false oath for purposes of § 727(a)(4)(A).[34]  Omitted information has been

deemed material where it "concern[s] the existence and disposition" of a debtor's property.[35]

Because the debtor is usually the only person able to testify directly concerning intent, "fraudulent

intent may be deduced from the facts and circumstances of a case."[36]  A "reckless indifference to the

truth has consistently been treated as the functional equivalent of fraud for purposes of

§ 727(a)(4)(A)."[37]  At least one court has noted that "the greater the number of assets or transactions

---

[34]  *See Job v. Calder (In re Calder)*, 907 F.2d 953, 955 (10th Cir. 1990).

[35]  *Id.* (citing *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984)).

[36]  *Id.* at 955-56.  Although not directly on point, the Court has found helpful certain cases dealing with revocation of discharge for failure to disclose assets under § 727(d)(2).  The United States Court of Appeals for the Seventh Circuit has held that

> [t]o find the requisite degree of fraudulent intent, the court must find the debtor knowingly intended to defraud the trustee, or engaged in such reckless behavior as to justify the finding of fraud.  The trustee may prove the debtor's fraud by evidence of the debtor's awareness of the omitted asset and by showing that the debtor knew that failure to list the asset could seriously mislead the trustee or that the debtor acted so recklessly in not reporting the asset that fraud is implied.  The bankruptcy court's finding of fraudulent intent may be based on inferences drawn from a course of conduct.  Additionally, fraudulent intent may also be inferred from all of the surrounding circumstances.

*In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992) (citations omitted).  *See also Kaler v. Olmstead (In re Olmstead)*, 220 B.R. 986, 994 (Bankr. D.N.D. 1998) (quoting *Yonikus*); *Rezin v. Barr (In re Barr)*, 207 B.R. 168, 176 (Bankr. N.D. Ill. 1997) (fraud "may be proven by evidence that Debtors were aware the omitted assets existed and that they knew failure to list the assets would mislead creditors or the Trustee").

[37]  *The Cadle Company v. King (In re King)*, 272 B.R. 281, 302 (Bankr. N.D. Okla. 2002) (*quoting In re Tully*, 818 F.2d 106, 112 (1st Cir. 1987)). *See also Stamat v. Neary*, 635 F.3d 974, 982 (7th Cir. 2011); *Booth v. Booth (In re Booth)*, 70 B.R. 391, 395 (Bankr. D. Colo. 1987) (finding "a reckless indifference to the truth by the debtor" to be among the "badges" whose existence may establish fraudulent intent under § 727).

that are not disclosed, the greater the inference of intent to defraud."[38]

The United States Court of Appeals for the Tenth Circuit has given us further guidance in the application of § 727(a)(4)(A). It has held that "[a] debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence."[39] We have also been instructed that "an honest error or mere inaccuracy is not a proper basis for denial of discharge."[40] But a debtor may not escape a denial of discharge under § 727(a)(4)(A) by asserting that the omitted information concerned assets that he or she believed to be worthless.[41]

David Miller admits that the original schedules and statements of financial affairs filed in his personal and the Trinity Restoration and Chateau business cases contain numerous errors and omissions. The omissions are so numerous that the Court will note only the most egregious here. David Miller failed to disclose that televisions and promotional materials, property of either Trinity Restoration or Chateau, were located in the Millers' home. He failed to disclose in the Chateau business case that its property was located at the retail business location of The Home Collection. He failed to disclose that, on the Petition Date, property of Trinity Restoration and/or Chateau was located at the Vans Glen Property. He failed to disclose the December 2008 lawsuit by Tulsa National Bank in either his personal case or the Trinity Restoration case. He failed to disclose the

---

[38]  *Law Office of Larry A. Henning v. Mellor (In re Mellor)*, 226 B.R. 451, 459 (D. Colo. 1998) (citing *In re Calder*, 907 F.2d at 956 (finding "not one but four separate omissions")). *See also Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d at 252 ("not one false oath, but three, and that the effect of these false oaths was to conceal from the bankruptcy court and the trustee a pattern of gratuitous transfers of property").

[39]  *In re Brown*, 108 F.3d at 1294.

[40]  *Id.* at 1295.

[41]  *In re Calder*, 907 F.2d at 955 (citing *In re Chalik*, 748 F.2d 616 (11th Cir. 1984)).

23

transfer of a 2002 Honda Motorcycle to Smith in December 2008, the transfer of Trinity Restoration's interest in two trucks to Smith in January 2009, or the transfer of Trinity Restoration's interest in a truck to Greg Lusby in December 2008.  He failed to disclose that he had registered the trade names of Tulsa Paint Body Mechanical Restoration Inc. and Trinity Collision, Inc. within two months of the Petition Date.  He failed to disclose his interest in 9800 Memorial even though this entity executed the lease for one of Trinity Restoration's business locations.  He failed to disclose that he, on behalf of Trinity Restoration, had borrowed $154,000 from his step-father, Ronald Hoffman and failed to list Mr. Hoffman as a creditor in any case.  The existence of vehicles transferred to Smith and Greg Lusby, the location of Trinity Restoration and Chateau property, and the identification of businesses registered by David Miller all relate to the existence or disposition of property of these bankruptcy estates, and are thus material.[42]

Any one of these omissions, standing alone, would raise a concern that David Miller was not being candid with the Court, the trustee, and his creditors.  David Miller showed a reckless, even cavalier, indifference for the truth when he presented the original schedules and statements to the Court, despite declarations that the schedules and statements in these three cases were true and correct to the best of his knowledge.  Looking at these omissions as a whole, the Court concludes that they were made knowingly and fraudulently.

David Miller built a multi-million dollar business that operated out of multiple locations. He attempts to portray himself as a brilliant marketer and salesman so lacking in business acumen that he had no understanding of the financial workings of his business operations, which led him to compile incorrect and inadequate books.  The Court is not persuaded, and finds David Miller to be

---

[42] *See In re Calder*, 907 F.2d at 955.

intelligent and articulate regarding his financial affairs as it suits his purposes.  To the extent David Miller failed to grasp the details of his personal or business affairs, and to the extent this led him to submit grossly deficient schedules and statements in these bankruptcy cases, the failure is one of choice and convenience rather than a lack of intellectual ability.

David Miller argues that the omissions in the schedules and statements in his individual case and the two business cases were the result of inadvertence.  He argues that he was simply "overwhelmed" by the closing of Trinity Restoration, the mad scramble to return tools and vehicles to employees and customers, the rush to relocate Trinity Restoration's and Chateau's physical assets in order to vacate leased buildings to assist his landlords, and the burden of compiling detailed information for his personal and two business bankruptcy cases.  The Court is aware that closing a business and filing bankruptcy can be both stressful and chaotic.  But the bankruptcy process places certain obligations of candor and attention to detail on those seeking relief.  Having undertaken the responsibility for the scattering of Trinity Restoration's and Chateau's property among and between its various locations, David Miller either could not or would not identify the location of that property in the original bankruptcy schedules filed in the three related cases.  The Court cannot excuse vast and substantial omissions in schedules and statements of financial affairs on the premise that a debtor was overwhelmed by the process.

David Miller was provided a questionnaire by his attorney that solicited much of the information later used to produce the original schedules and statement of financial affairs in the Defendants' personal case.[43]  When asked why his responses to the questionnaire seemed almost cursory, David Miller repeatedly referred to the responses as a "very, very first draft," and to his

---

[43]  *See* Plaintiff's Ex. 11.

expectation of further reviewing the material with his attorney.  Yet the schedules and statement of

financial affairs ultimately filed in the Defendants' case do not appreciably expound on the

information provided by the Defendants in their response to the questionnaire.[44]  David Miller

presented no testimony or evidence that the filing date of these bankruptcies was motivated by any

emergency that would have required the filing of incomplete documents.

David Miller argues that the omissions in the original documents identified by the Plaintiff

have been corrected through amendments filed in each of the three bankruptcy cases.  The Court

notes that the amendments were filed shortly before the trial on this matter, some 22 months after

the Petition Date.  Even now, the Court is not convinced that David Miller ever set out to conduct

a comprehensive evaluation of the schedules and statements of either his personal or the two

corporate cases.  He has merely made an effort to respond to concerns raised by the trustee and

affected creditors.[45]  One court summarized the law in this regard as follows:

> As a matter of law, no inference of fraudulent intent can be drawn from an omission
> when the debtor promptly brings it to the court's or trustee's attention absent other
> evidence of fraud. *In re Brown*, 108 F.3d at 1294. Further, a debtor's voluntary filing
> of an amendment as soon as practicable may be accepted as evidence of the absence
> of the element of the fraudulent intent necessary to sustain a § 727(a)(4)(A) claim.

---

[44]  Although not raised by either party, the Court cannot ignore that some of the
information provided to the Millers' attorney on the questionnaire was omitted from the original
schedules and statements filed in their personal case.  *See* Plaintiff's Ex. 11 and *supra* notes 25,
26, and 28.  While not excusing those omissions, the Court has not considered them as part of its
analysis of § 727(a)(4)(A).

[45]  *See* Defendant David Miller's Closing Argument, *Docket No. 45-1*, at 5 ("Post-
petition, Mr. Miller's attention naturally turned to concerns about his future, and, more
immediately, to finding a job, and earning a living. . . . Mr. Miller did not realize the extent of
the errors and omissions in his personal and corporate bankruptcy filings until the chapter 7
Trustee and the United States Trustee, aided by several unhappy creditors and former employees,
began identifying and pointing out errors and omissions in those original filings. Naturally, the
longer and harder Mr. Miller's detractors looked, the more problems they identified.").

*In re Kelly*, 135 B.R. 459, 461 (Bankr. S.D.N.Y. 1992); *In re Shebel*, 54 B.R. 199, 202-205 (Bankr. D. Vt. 1985). <u>An inference of fraud is permissible, however, when the evidence indicates that the amendment is not in fact voluntary because the amendment is offered only as a result of developments during the meeting of creditors, after the debtor "knew that the cat was out of the bag," well after the meeting of creditors, or without adequate explanation of the reason for their initial inaccuracy.</u> *In re Mumin*, 1998 WL 160992, *3 (Bankr. E.D. Pa. 1998) (unpublished opinion) (collecting multiple cases).[46]

The Court finds that the bulk of the amendments filed in the three cases were not voluntary, but instead addressed omissions identified by the Plaintiff or other creditors. David Miller gave no reason for the delay in amending the schedules and statements in the three cases, except for noting the "added expense and problems that would result" from piecemeal amendments.[47] Although the Court applauds David Miller's efforts to correct the statements and schedules filed in the related bankruptcies, it does not find that those efforts are sufficient to overcome the finding that the omissions in the original schedules and statements were knowingly made with fraudulent intent under § 727(a)(4)(A).

***Heather Miller***[48]

Section 727(a)(2)(A) of the Code provides that a discharge may be denied where "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(A) property of the

---

[46] *Law Office of Larry A. Henning v. Mellor (In re Mellor)*, 226 B.R. 451, 459–60 (D. Colo. 1998) (emphasis added).

[47] *See* Defendant David Miller's Closing Argument, *Docket No. 45-1*, at 6.

[48] Although many of the conclusions in this section could be equally applied to David Miller, the Court is aware that it must evaluate the debtors as individuals for purposes of finding that the provisions of § 727 are met.

debtor, within one year before the date of the filing of the petition[.]"[49]  A party objecting under this section "must show by a preponderance of the evidence that (1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the estate, (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor."[50]  "To deny a discharge under § 727(a)(2), a court must find *actual* intent to defraud creditors.  Because rare is the occasion when a party lays bare his or her subjective intent, fraudulent intent . . . may be established by circumstantial evidence, or by inferences drawn from a course of conduct."[51]  Among the badges or indicia from which a court may infer fraudulent intent are "situations in which a debtor conceals prebankruptcy conversions; converts assets immediately before the filing of the bankruptcy petition; gratuitously transfers property; continues to use transferred property; and transfers property to family members."[52]  The Court of Appeals for the Tenth Circuit has stated that "the inference of fraudulent behavior flowing from a concealment is greater than from a transfer[.]"[53]  The monetary value of the assets converted is also a factor in determining whether the debtor acted with fraudulent intent.[54]

With respect to Heather Miller, § 727(a)(2) has the potential to come into play on two fronts. The section will apply with respect to the transfer or concealment of assets that she owns.  It may

---

[49]  § 727(a)(2)(A).

[50]  *Mathai v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir. 2008) (quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d at 1290, 1292 (10th Cir. 1997)).

[51]  *Id.* (internal quotations and citations omitted).

[52]  *In re Carey*, 938 F.2d 1073, 1077 (10th Cir. 1991) (citations omitted).

[53]  *In re Brown*, 108 F.3d at 1293 n.1.

[54]  *In re Carey*, 938 F.2d at 1077.

also be applicable through § 727(a)(7) if Heather Miller was involved in the transfer or concealment

of assets owned by an insider.

*Chateau as an Insider of Heather Miller*

Section 727(a)(7) states that

(a) The court shall grant the debtor a discharge, unless–

(7) the debtor has committed any act specified in paragraph (2), (3), (4), (5),
or (6) of this subsection, on or within one year before the date of the filing
of the petition, or during the case, in connection with another case, under this
title or under the Bankruptcy Act, *concerning an insider*[.][55]

Where a debtor is an individual, the term "insider" includes: 1) a relative of the debtor or of a

general partner of the debtor; 2) a partnership in which the debtor is a general partner; 3) a general

partner of the debtor; or 4) a corporation of which the debtor is a director, officer, or person in

control.[56]  The term "includes," when used in the Bankruptcy Code, is not intended to be limiting.[57]

Courts have recognized that there are

two distinct types of insiders, [first] those entities specifically mentioned in the
statute ("relative," "partnership," "general partner," and "corporation"), i.e. per se
insiders, or [second] those not listed in the statutory definition, but who have a
sufficiently close relationship with the debtor that . . . conduct is made subject to
closer scrutiny than those dealing at arm's length with the debtor.[58]

---

[55]  § 727(a)(7) (emphasis added).

[56]  § 101(31)(A).

[57]  § 102(3).  *See also Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.)*, 531
F.3d 1272, 1276 (10th Cir. 2008).

[58]  *Rupp v. United Sec. Bank (In re Kunz)*, 489 F.3d 1072, 1079 (10th Cir. 2007) (quoting
*Miller Ave. Prof'l & Prom'l Serv. v. Brady (In re Enter. Acquisition Partners)*, 319 B.R. 626,
631 (9th Cir. BAP 2004)) (internal citations omitted).

An entity that falls within the second category is referred to as a "non-statutory insider."[59]  "The legislative history for the definition of 'insider' states that '[a]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms [sic] length with the debtor.'"[60]  The Court of Appeals for the Tenth Circuit has found that "it was the legislative intent that a person with a relationship designated in the statute be treated as an insider because of the high potential for control inherent in those relationships, and that other persons may be found to be insiders in particular cases, based on the specific facts."[61]

Plaintiff contends that Chateau is an insider of Heather Miller for purposes of § 727(a)(7). Heather Miller is an individual, so § 101(31)(A) applies.  The Court cannot find that Chateau is a statutory insider of Heather Miller under the plain language of the statute.[62]  As a corporation, Chateau can not be any person's relative; Chateau is not organized as a partnership; and despite Heather Miller's 50% ownership in Chateau, the Plaintiff did not make any assertion that she is a "director, officer, or person in control" of Chateau.  Therefore, in order to apply § 727(a)(7) to actions of Heather Miller, the Court will have to find that Chateau is a non-statutory insider of

---

[59]  *In re U.S. Medical*, 531 F.2d at 1276.

[60]  *Id.* at 1277 (citing S. Rep. No. 95-989, at 25 (1978), 1978 U.S.C.C.A.N. 5787, 5810; H.R. Rep. No. 95-595, at 312 (1977)).

[61]  *In re Kunz*, 489 F.3d 1072, 1079 (10th Cir. 2007).  *See also In re U.S. Medical*, 531 F.3d at 1278 ("non-statutory insiders are to be found by courts 'in particular cases, based on the specific facts.') (citing *In re Kunz*).

[62]  The Court notes that if the "debtor" at issue were Chateau, it would be easy to find that Heather Miller is a statutory insider of Chateau as defined by § 101(31)(B)(vi), because she is a relative of David Miller, the director/officer/person in control of Chateau.  But application of § 727(a)(7) requires that *the debtor* commit an act concerning an insider *of the debtor*.  For those that are lost, consider this simple logic problem.  Under the Code, finding that A is an insider of B does not *necessarily* imply that B is also an insider of A (although that is often the case).

Heather Miller.[63]

The Court of Appeals for the Tenth Circuit recently addressed the definition of a non-statutory insider in *Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.)*.[64]  The court held that in order to find a creditor was a non-statutory insider of a debtor, it would need evidence of both a close relationship or affinity between the parties, and that a less-than-arm's-length transfer or transaction had occurred.[65]  In *In re U.S. Medical, Inc.*, the court addressed whether a creditor would be considered an insider for purposes of § 547(b) (granting a trustee the authority to avoid a preferential transfer), where the CEO of the creditor was also a member of the debtor's board of directors.  Where the creditor was not a "person in control of the debtor," i.e., not a statutory insider, the court found that, despite the "extreme closeness" of the CEO's relationship with the debtor, in the absence of any evidence of a less-than-arm's-length transaction or that the creditor had exhibited

---

[63] Some courts have found that it is the debtor in the underlying case that must be an insider of an entity in another related case in order to apply § 727(a)(7). *See e.g., Redmond v. Karr (In re Karr)*, 442 B.R. 785, 796 (Bankr. D. Kan. 2011) ("The debtor must be an insider of the debtor in another case[.]").  In those cases, the individual debtor under scrutiny is almost universally a director/officer/person in control of a corporation in a related bankruptcy case.  Therefore the distinction of "who is an insider of whom" becomes a moot point, because the corporation is also, by definition, an insider of the debtor under § 101(31).  In cases that address the distinction, however, courts are careful to clarify that it is the corporation, which is also a debtor in a related case, that must be found to be an insider of the individual debtor in the underlying case, to whom § 727(a)(7) is being applied.  *See e.g., Groman v. Watman (In re Watman)*, 301 F.3d 3, 7–8 (1st Cir. 2002), *aff'd after remand,* 458 F.3d 26, 30 n.3 (1st Cir. 2006) (found corporation to be insider of individual debtor); *Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 394 n.2 (6th Cir. 1994), *aff'g* 171 B.R. 298, 302 (W.D. Tenn 1992) (same); *Mercantile Bank of Joplin v. Nicsinger (In re Nicsinger)*, 136 B.R. 228, 233 (W.D. Mo. 1992) (same); *EPIC Aviation, LLC v. Phillips (In re Phillips)*, 418 B.R. 445, 450–51 (Bankr. M.D. Fla. 2009) (same).

[64] 531 F.3d 1272 (10th Cir. 2008).

[65] *Id.* at 1280.

an undue influence or control over the debtor, the creditor was not a non-statutory insider.[66]

        While *In re U.S. Medical* is not directly on point, it provides important insights to the case at bar.  The lesson from *In re U.S. Medical* is that simply finding a close relationship, other than one specifically enumerated in § 101(31), may not be enough, and that courts should look at the specific facts of a case in order to determine non-statutory insider status.  While not technically a person in control of Chateau, as the spouse of the sole director and officer, and as a 50% owner, Heather Miller certainly has the requisite close relationship or affinity to Chateau.  In this case, the facts show that property of Chateau was moved at the direction and control of Heather Miller to her retail space at The Home Collection.  During a time when the property of Chateau was generally being scattered among David Miller's multiple business locations, Heather Miller was an active participant in the moving of the Hawley Furniture, indicating what pieces would be moved to The Home Collection and directing persons where to deliver it.  Once the Hawley Furniture was relocated to The Home Collection, Heather Miller indicated that she placed it in a particular location away from the showroom floor, and that she maintained total control over its further disposition.  To the extent that Chateau's property was delivered to her home, Heather Miller willingly accepted the property and made accommodation for it.  Based on these facts, the Court finds that her dealings with Chateau are sufficiently close to find that it qualifies as a non-statutory insider of Heather Miller in her personal case.

*Chateau's Property*

        Having determined that Chateau is an insider of Heather Miller, her actions with respect to the property of Chateau within one year before the Petition Date can now be scrutinized under

---

[66] *Id.* at 1278.

32

§ 727(a)(2)(A). When Heather Miller assumed control over the Hawley Furniture, directed its relocation from the South Tulsa Location to The Home Collection, and stored it there without informing the creditors of Chateau of the location of that property, she had 1) removed and concealed; 2) property of Chateau; 3) within one year before the Petition Date. While it is unclear what role Heather Miller played in the removal of Chateau's property (the plasma TVs) to her home, there is no question that once it arrived there she assumed control over the property and participated in its concealment. Whether she undertook these acts with the intent to hinder, delay, or defraud creditors of Chateau is the only element left to be determined.

Given the actions of Heather Miller and the time line of those actions, the Court draws the conclusion that she removed and concealed the Hawley Furniture located at the Home Collection, and concealed the Chateau property located at her personal residence, with the intent to hinder, delay, or defraud Chateau's creditors. The removal of the Hawley Furniture from the South Tulsa Location took place at a time when the Trinity Restoration business had closed and the Millers had already consulted with counsel and knew that bankruptcy filings were imminent. Despite that knowledge, Heather Miller directed the removal of property to The Home Collection and to her home, places she knew that Chateau's creditors were not likely to come around looking for Chateau's property. She made no effort to inform Chateau's creditors of the location of the property, either by taking a more active role in the preparation of Chateau's petition and schedules, or by disclosing in her personal case that she was holding property of Chateau. The Court finds credible the testimony of Yonce that Heather Miller indicated an intention to liquidate the Hawley Furniture outside of the bankruptcy process in order to repay a debt to him. Despite statements Heather Miller now makes that she did not intend to sell the Hawley Furniture, and that she "knew

someone would be coming to take it," she chose to omit any information from her bankruptcy papers

that would have informed anyone of the location of that property.  The failure of Heather Miller to

disclose the location of Chateau's property in her bankruptcy papers adds to the inference that the

concealment of the property was done with the intent to hinder, delay, or defraud the creditors of

Chateau.

*The Bronco*

The transfer of the Bronco from the Millers to Paul Williams, Heather Miller's father, is also

subject to scrutiny under § 727(a)(2)(A).  The Bronco was 1) property of the Millers; 2) that was

transferred by the Millers; 3) within one year before the Petition Date.  The transfer is infected with

several of the badges of fraud outlined by the Court of Appeals for the Tenth Circuit in *In re Carey*.[67]

The Bronco was transferred approximately one month before the Petition Date, but after David

Miller had announced the closing of Trinity Restoration and after the Millers had consulted counsel

regarding the possibility of filing bankruptcy.  The transfer was made to Heather Miller's father,

with whom she testified that she maintained a close family relationship.  The Bronco was transferred

for $1,000, even though David Miller had appraised it at $8,000.  This suggests that this was a

gratuitous transfer rather than an arm's length transaction.[68]

The Defendants refer the Court to *Gullickson v. Brown (In re Brown)*[69] for the proposition

that a transfer made in close proximity to the filing of a bankruptcy petition is not per se evidence

---

[67] *In re Carey*, 938 F.2d 1073, 1077 (10th Cir. 1991) (citations omitted).  *See supra* text accompanying note 52.

[68] Because it appears that the transfer was known by the Defendants' attorney as of the Petition Date, the Court will not give any weight to the failure of the Defendants to disclose the transfer in their original statement of financial affairs.

[69] 108 F.3d 1290, 1293 (10th Cir. 1997).

of fraud.[70]  According to the court in *In re Brown*, "[t]he mere fact that a transaction occurred soon before the filing of bankruptcy does not necessarily support the inference of fraud.  The circumstances of the transaction must be examined."[71]  In *In re Brown*, the court found that the transaction at issue had taken place for legitimate business reasons, in a last ditch effort to save the debtor's business.  In applying *In re Brown*'s mandate to consider all of the circumstances of a given transaction, the Court notes that the transfer of the Bronco took place at a time after David Miller had announced the closing of Trinity Restoration, and after the Millers had consulted with counsel and made the decision to file for bankruptcy protection.  When asked why the Millers transferred the Bronco to Mr. Williams on the eve of bankruptcy, David Miller gave a very revealing answer: "Just because he liked it and – same reason that Bill and Greg wanted the trucks.  They wanted to buy them."[72]  In response to the same question, Heather Miller stated:

> Well, (1) I was tired of it being in our garage; (2) it was not a practical everyday car, so -- and there was a lot of things wrong with the car, so I just offered it to my father and he plays golf. I figured he might want to put his golf clubs in and go play golf. You know, I didn't think of it like that. He used to be a car salesman. He buys cars.[73]

The crux of the matter is that Defendants knew that their bankruptcy filing was imminent and they knew that any non-exempt assets would be liquidated for the benefit of their creditors.[74]  Instead of

---

[70]  Defendant David Miller's Closing Argument, *Docket No. 45-1*, at 37, which is incorporated by reference into Defendant Heather Miller's Closing Argument, *Docket No. 41*, at 5.

[71]  *In re Brown*, 108 F.3d at 1293 (citations omitted).

[72]  Plaintiff's Ex. 10, at 106.

[73]  *See Transcript of Trial, November 9, 2010, Docket No. 48*, p. 42, *ll*. 8 – 13.

[74]  Defendants argue that the Bronco would have been exempt had it been retained, therefore the transfer did not harm creditors.  This argument doesn't hold up in the face of the questionnaire provided to Mr. Henshaw, which suggests that the Millers intended to keep two

preserving assets for the benefit of those creditors, they instead chose to prefer family and friends by effectively giving away assets for nominal consideration.  No legitimate economic or business reason was given for the transfer of the Bronco.  The Court can only infer a fraudulent attempt by Heather Miller (as well as David Miller) to transfer the Bronco to an insider to the detriment of their creditors.

*The Home Collection Stock*

The Plaintiff made much of the transfer in the month before the Petition Date of Heather Miller's controlling interest in The Home Collection to Maureen Gribben, who was previously the minority shareholder.  While the transfer of Heather Miller's shares appears to be gratuitous, in that it took place for no consideration, that does not tell the whole story.  Heather Miller testified that the transfer was made on the advice of her bankruptcy counsel so that The Home Collection would not be affected by her personal bankruptcy.  The Court will not allow a debtor to hide behind advice of counsel if he or she knows that the purpose of a transfer is to hinder or delay creditors.[75]  But the Plaintiff's allegations regarding the transfer of stock suffer from a fundamental omission.  Even if a debtor is found to possess the requisite intent to defraud under § 727(a)(2), "[t]he debtor's intent must be coupled with the transfer of the debtor's property which reduces assets available to other creditors."[76]  The Plaintiff presented no evidence that the stock of The Home Collection had any

---

other vehicles, which would have exhausted their exemptions under Oklahoma law.  *See* Plaintiff's Ex. 11 at 7.  The fact that one of those vehicles was eventually surrendered does not change the fact that at the time of the transfer of the Bronco, the Defendants believed that it was not protected by an exemption.

[75]  *See Cuervo v. Snell (In re Snell)*, 240 B.R. 728, 730–31 (Bankr. S.D. Ohio 1999) (citing *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir. 1986)).

[76]  *Booth v. Booth (In re Booth)*, 70 B.R. 391, 395 (Bankr. D. Colo. 1987) (noting that the distinction has been expressly recognized in the Tenth Circuit and citing cases).

value at the time it was transferred to Gribben.[77]  In the absence of evidence that this transfer operated to reduce the assets available to the Millers' creditors, the Court has not considered the stock transfer when reaching its conclusion in this case.[78]

## Conclusion

The Court is mindful that objections to discharge should be construed liberally in favor of debtors and strictly against objecting parties.[79]  But the Court must also recognize that a bankruptcy discharge is a privilege reserved for the honest debtor.[80]  Based on the discussion above, the Court concludes that the Plaintiff has met his burden by a preponderance of the evidence with respect to David Miller under § 727(a)(4)(A) and (a)(7), and with respect to Heather Miller under § 727(a)(2)(A) and (a)(7).  Neither of the Defendants presented sufficient evidence to overcome the inference of fraudulent intent under those sections.  The Court concludes that the discharge of each Defendant should be denied under these sections of § 727.  As a result, the Court will not consider the Plaintiff's claims against the Defendants under other sections of § 727.[81]

A separate judgment in accordance with this Memorandum Opinion is entered concurrently

---

[77]  Kirtley has filed an adversary proceeding to recover the value of Heather Miller's interest in The Home Collection from Gribben for the Millers' estate.  The Court is therefore purposely limiting its remarks regarding the stock or its transfer.  The Court only notes that no evidence was presented in *this* adversary proceeding that the stock had any value.

[78]  The Court notes that the transaction was sufficiently disclosed in the Millers' statement of financial affairs so as to allow Kirtley to investigate the transfer.

[79]  *See Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997).

[80]  *See In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996); *Panda Herbal Int'l, Inc. v. Luby (In re Luby)*, 438 B.R. 817, 826 ("[W]here a debtor has been dishonest in his dealings with the court or his creditors, it may be appropriate to deny his discharge, notwithstanding that an underlying goal of federal bankruptcy law is to provide a debtor with a fresh start.").

[81]  *See Woolman v. Wallace (In re Wallace)*, 289 B.R. 428, 436 (Bankr. N.D. Okla. 2003).

herewith.

Dated this 29th day of April, 2011.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

6078